O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY MANSDORF, individually and as Trustee of the Mansdorf Family Trust,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>WALLACE PATRICK MORIARTY; RUFUS VON THALEN RHOADES; SUSAN RHOADES; MICHELE GIACOMAZZA; KATHRYN GATTO; JANICE McCLANAHAN; TIMOTHY B. SOTTILE; THOMAS CACCIATORE; RICHARD PERCELL; WHITEBIRD, INC.; IMAGES N THIS INC; THE WALKEMPLUE TRUST,<br><br>　　　　　Defendants.<br>_____ | Case No. CV 12-01339 DDP (JCGx)<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>[Dkt. No. 31, 43, 48, 49, 50] |

　　　Presently before the court are four motions to dismiss filed by Defendants Janice McClanahan, Susan Rhoades, Rufus von Thalen Rhoades, the Walkemplue Trust, Whitebird, Inc., and Richard Percell.  Defendant Wallace Patrick Moriarty joins in the motion filed be Defendants Suand and Rufus Rhoades and the Walkemplue Trust.  Having considered the submissions of the parties and heard

oral argument, the court grants the motions and adopts the following order.

**I.   Background**

Plaintiff's Second Amended Complaint ("SAC"), filed with leave of the court, is difficult to follow. Here follows a summation of the relevant allegations of the SAC.

Plaintiff Harry Mansdorf ("Mansdorf") is the 91-year old Trustee of the Mansdorf Family Trust (the "Family Trust"). (SAC ¶ 8.) Mansdorf succeeded his brother, Lee Mansdorf ("Lee"), as Trustee upon Lee's death in 2003. (Id.)

The SAC alleges that Lee discovered "something foul in his business dealings" in 1981. (SAC ¶ 21.) Defendant Moriarty, whose relationship to Mansdorf and the Family Trust is unclear, and who may have used an alias, somehow took out loans on Family Trust property, conveyed that property to straw buyers, and "skimmed money from the transactions." (SAC ¶¶ 9, 21, 25) Defendent Rufus von Thalen Rhoades ("Rhoades), who represented the Family Trust "beginning in the 1980s" was somehow "involved," and "arranged for a variety of agreements that were used . . to steal [Family] Trust property." (SAC ¶¶ 10, 21.) Mansdorf alleges that "portions of the scam were initiated and set into place beginning in the 1980s and continuing through 2003." (SAC ¶ 22.)

The SAC further alleges that in 1988 and 2003, someone named Keith Card, who is not a defendant and may be deceased, transferred unspecified real property to Defendant Janice McClanahan, Lee's former girlfriend. (SAC ¶¶ 23, 24, 26.) The SAC does not explain Keith Card's relationship to anyone, but asserts that he was a "key player." (SAC ¶ 23.) The SAC does not appear to allege any

2

wrongdoing on McClanahan's part with respect to these transactions, though the relevant parcels later became the focus of litigation in state court.

In 1996, Lee, the Trustee of the Family Trust, had a heart attack. (SAC ¶ 27.) While Lee was recovering, Defendant Rhoades allegedly created an agreement, under which Rhoades would "accommodate Lee Mansdorf's wishes to accept at least $750,000 from DEFENDANT Whitebird [Inc.] for the Mansdorf's (sic) La Tuna Canyon property." (SAC ¶ 27.) Under the agreement, Rhoades would forward the sale proceeds to Defendant the Walkemplue Trust, to whom Lee owed $850,000 in fees for legal services rendered by Rhoades. (SAC ¶ 27.) Defendant Susan Rhoades, Rhoades' wife, was the Trustee of the Walkemplue Trust. (SAC ¶ 18.) The SAC alleges that the agreement was a "scheme to steal Mansdorf trust property," and that Lee did not owe Rhoades or the Walkemplue Trust $850,000. (SAC ¶ 27.) Rhoades also encouraged Lee to assert that Rhoades was Lee's agent as a means of evading taxes. (SAC ¶ 28.)

Defendant Richard Percell is "a representative" of Whitebird, the company that bought the La Tuna Canyon property. (SAC ¶ 15.) Though Percell is not a licensed real estate broker, he acted as agent for both the Family Trust and Whitebird for the 1996 La Tuna Canyon property sale. (SAC ¶ 18.) Percell knew McClanahan, to whom he had been introduced by Lee. (SAC ¶ 31.) Some of the 1996 La Tuna Canyon property sale parcels aomehow ended up in McClanahan's name. (SAC ¶ 31.) Lee also had an agreement with Defendant Image N' This, of which Percell is a director, to sell certain La Tuna Canyon property, though it is unclear whether this transaction ever occurred. (SAC ¶ 31.)

3

In 2003, Mansdorf, allegedly at Rhoades' behest, asked McClanahan to give back some of the La Tuna Canyon property "to settle the death taxes for Lee." (SAC ¶ 37.) Either McClanahan, Whitebird, or both then conveyed or attempted to convey La Tuna Canyon property back to the Family Trust. (SAC ¶ 37-39.) In 2006, however, Percell told McClanahan that Mansdorf sold the property for a substantial some of money. (SAC ¶ 37.) McClanahan then sued Mansdorf and obtained a $12 million default judgment. (SAC ¶ 37.) The SAC alleges that McClanahan perjured herself and filed a false deed to obtain the judgment. (SAC ¶ 37.)

Around this time, the SAC alleges that Mansdorf was being financially and physically abused by Defendant Michele Giacomazza. (SAC ¶ 39.) Giacomazza, whose relationship to Mansdorf is unclear, allegedly was "attempting to steal" some of the parcels of property at issue in McClanahan's suit against Mansdorf. (SAC ¶ 40.)

The SAC goes on to describe two "significant lawsuit[s}" between Plaintiff Mansdorf and Giacomazza in 2008. The SAC alleges that Mansdorf recovered some Malibu property from Giacomazza and prevailed in an unlawful detainer case brought by Giacomazza. (SAC ¶¶ 32, 33.) The SAC further alleges that "transactions were revealed involving [Giacomazza] and his daughter, DEFENDANT Gatto, where the same essential scam that was previously perpetrated by DEFENDANT'S (sic) Moriarty, Rhoades, Percell, and Whitebird was again being perpetrated." (SAC ¶ 33.) The SAC further asserts that "the same key players . . . evidence the strongest link between the two scams." (SAC ¶ 33.) The SAC also refers to allegedly perjurious testimony given by McClanahan in connection with the Giacommaza actions, which allegedly illustrate that

4

"McClanahan and her attorneys are knowingly and flagrantly attempting to steal [Mansdorf's] home and throw him out on the street just as DEFENDANT Giacomazza tried to do." (SAC ¶ 33.)

In 2009, Mansdorf recovered documents which had been stolen from the family home in 2004. (SAC ¶ 62.) The documents allegedly indicate that Rhoades knew that Lee's former counsel was a business associate of Moriarty. (SAC ¶ 66.)

The SAC alleges a cause of action against all defendants for a violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 et seq.,[1] as well as several state law causes of action. McClanahan, Susan Rhoades, Rhoades, the Walkemplue Trust, Whitebird, Inc., and Richard Percell now move to dismiss the SAC.

**II. Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 129 S. Ct. at 1949. Conclusory allegations or allegations that are no more than a statement of a legal conclusion

---

[1] The SAC does not identify whether the conduct alleged falls under 18 U.S.C. § 1962(a), (b), (c), or (d).

"are not entitled to the assumption of truth." Id. at 1950. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. Id. at 1949 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." Id. at 1950. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." Twombly, 550 U.S. at 555-56. "Determining whether a complaint states a plausible claim for relief" is a "context-specific" task, "requiring the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950.

**III. Discussion**

Though the SAC represents Plaintiff's third attempt to file an adequate pleading, it remains disorganized, convoluted, and cluttered by inflammatory language, irrelevancies, and "interesting aside[s]." The SAC fails to provide the "short and plain" statement of claims required under Federal Rule of Civil Procedure 8(a). See Cafasso v. General Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058-1059 (9th Cir. 2011).

Furthermore, though Plaintiff's RICO claim provides the only independent basis for this court's jurisdiction, the SAC's Third Cause of Action for RICO violation is nothing more than a bare recitation of the elements of the offense. See Living Designs, Inc., v. E.I. Dupont de Nemours and Co., 431 F.3d 353, 361 (9th

6

Cir. 2005) (listing elements). The RICO allegations do not identify any conduct that constitutes racketeering activity, let alone a pattern of such conduct. Nor does the SAC appear to allege any facts suggesting the existence of a coherent enterprise, the structure or membership of any such enterprise, or how Plaintiff was injured.

Finally, most, if not all, of the allegations of the FAC appear to fall outside of the four-year statute of limitations for RICO claims. See Pincay v. Andrews, 238 F.3d 1106, 1108 (9th Cir. 2001). The limitations period "begins to run when a plaintiff knows or should know of the injury which is the basis for the action." Living Designs, 431 F.3d at 365. "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." Id. (Quoting Pincay, 238 F.3d at 1110). The only fact alleged within the four-year claim period appears to be the 2009 rediscovery of certain documents relating to real estate transactions made decades earlier. The SAC does not explain why that information, perhaps obtained for the first time by Mansdorf in 2009, was not available to Lee and the Family Trust as early as 1981, nor how Rhoades' knowledge of a business relationship between Moriarty and Lee's former counsel has any bearing on the RICO claim.

Given the obvious deficiencies of the SAC, Plaintiff's Third Cause of Action for violation of RICO is dismissed, with leave to amend. Having dismissed Plaintiff's only federal claim, the court declines to exercise supplemental jurisdiction over the remaining

state law claims. 28 U.S.C. §1367(a). The court takes no position on the viability of those claims at this juncture.

**IV. Conclusion**

For the reasons stated above, Defendants' Motions to Dismiss are GRANTED. The Second Amended Complaint is DISMISSED, with leave to amend. Any amended complaint shall be filed within ten days of the date of this order.

IT IS SO ORDERED.

Dated: July 25, 2012

DEAN D. PREGERSON
United States District Judge